```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _9/30/2024_
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CLONEY'S PHARAMACY, INC., WILLOW
CREEK PHARMACY, INC., and JCH
PHARMACY HOLDINGS, INC., *on behalf of
themselves and all others similarly situated*,

                              Plaintiffs,

                -against-

WELLPARTNER, INC. and
WELLPARTNER, LLC,

                              Defendants.

---

1:23-cv-10088-MKV

**OPINION AND ORDER GRANTING
MOTION TO STAY IN FAVOR OF
ARBITRATION**

MARY KAY VYSKOCIL, United States District Judge:

Plaintiffs Cloney's Pharmacy, Inc. ("Cloney's"), Willow Creek Pharmacy, Inc. ("Willow Creek"), and JCH Pharmacy Holdings, Inc., doing business as Pucci's Pharmacy ("Pucci's), three independent pharmacies, bring this putative class action against Defendant Wellpartner, LLC[1], a third-party administrator providing services to participants in the federal 340B Drug Pricing Program, alleging that Defendant overcharged Plaintiffs in breach of the parties' contracts. Defendant moves to dismiss or to stay this action in favor of arbitration. For the following reasons, Defendant's motion is GRANTED and this case is stayed pending arbitration.

**FACTUAL BACKGROUND[2]**

Plaintiffs are owners and operators of three independent pharmacies located in and organized under the laws of California. Compl. ¶¶ 2, 13–15. Plaintiffs participate as contract

---

[1] Plaintiffs voluntarily dismissed Defendant Wellpartner, Inc. from this action. [ECF No. 17].

[2] The factual background is drawn from Plaintiffs' complaint [ECF No. 1 ("Complaint" or "Compl.")] as well as the parties' submissions in support of and in opposition to the present motion. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). These documents include the following: Defendant's memorandum of law in support of its motion [ECF No. 19 ("Def. Mem.")], supported by the Declaration of Katherine Trefz and its exhibits, including the Caremark Provider Agreement ("CPA") between Caremark and Cloney's, signed in July 2014 [ECF No. 19-2 ("Cloney's CPA")]; the CPA between Caremark and Pucci's, signed in August 2016 [ECF No. 19-3 ("Pucci's CPA")];

pharmacies ("Contract Pharmacies") in the federal 340B Drug Pricing Program ("340B"), which assists covered healthcare facilities ("Covered Entities) in serving poor and uninsured communities by permitting Covered Entities to purchase certain outpatient prescription drugs at a discount, but be reimbursed for those drugs at the market rate. Compl. ¶¶ 22–23, 34. As Contract Pharmacies, Plaintiffs order, store, and dispense drugs to 340B-eligible patients of the Covered Entities and collect payment from the patients and their health insurance. Compl. ¶ 31.

Defendant, organized under the laws of Delaware with its principal place of business in New York, is the nation's largest 340B third-party administrator ("TPA").[3] Compl. ¶¶ 2, 17, 47. 340B TPAs like Defendant provide technical, compliance, and administrative services for Covered Entities, including by managing the relationships between Covered Entities and Contract Pharmacies, such as by managing drug inventory, calculating amounts owed on 340B-eligible prescriptions, and coordinating the transfer of those funds from Contract Pharmacies to Covered Entities. Compl. ¶¶ 41–45.

As Contract Pharmacies, Plaintiffs entered into Contract Pharmacy Services Agreements ("CPSAs") with Defendant[4] and non-party Covered Entities.[5] Compl. ¶¶ 13–15, 49–50. Under

---

[3] the CPA between Caremark and Willow Creek, signed in October 2020 [ECF No. 19-4 ("Willow Creek CPA")]; excerpts from the Caremark Provider Manual ("CPM") as of July 2014 [ECF No. 19-5 ("2014 CPM")], August 2016 [ECF No. 19-6 ("2016 CPM")], October 2010 [ECF No. 19-7 ("2010 CPM")], and 2022 [ECF No. 19-8 ("2022 CPM")]; and an amendment to the arbitration provision of the CPM effective as of August 10, 2023 [ECF No. 19-9 ("2023 Arbitration Clause")]; Plaintiffs' memorandum of law in opposition to the motion [ECF No. 21 ("Pl. Mem.")] and its exhibits, the Cloney's Contract Pharmacy Services Agreement ("CPSA") [ECF No. 21-1 ("Cloney's CPSA")]; the Willow Creek CPSA [ECF No. 21-2 ("Willow Creek CPSA")]; and the Pucci's CPSA [ECF No. 21-3 ("Pucci's CPSA")]; and Defendant's memorandum of law in further support of its motion [ECF No. 23 ("Def. Reply")].

[3] Defendant is a wholly owned subsidiary of non-party CVS Health, Inc. ("CVS Health"), which is headquartered and has its principal place of business in Rhode Island. Compl. ¶ 18.

[4] The Court notes, however, that Defendant is not a named party to the Willow Creek CPSA. *See* Willow Creek CPSA 1 (defining "Parties" as the Contract Pharmacy, Willow Creek, and the Covered Entity).

[5] Each CPSA contains a choice-of-law provision providing for the application of Oregon law. Cloney's CPSA ¶ 8.11; Willow Creek CPSA ¶ 8.11; Pucci's CPSA ¶ 8.11. None of the CPSAs, however, designates a forum—judicial, arbitral, or otherwise—for the resolution of disputes. Each CPSA provides that the CPSA "constitute[s] the entire

the CPSAs, Defendant bills Plaintiffs twice per month for payments due in connection with 340B drugs dispensed by Plaintiffs ("Remittances"). Compl. ¶ 52; Cloney's CPSA ¶ 3.2; Willow Creek CPSA ¶ 3.3; Pucci's CPSA ¶ 3.2. Remittances "represent the difference between the payments received by Contract Pharmacy from payers and patients, less 340B Contract Pharmacy dispensing fees and credits appropriately applied by [Defendant]." Compl. ¶ 54; Cloney's CPSA ¶ 3.3; Willow Creek CPSA ¶ 3.5; Pucci's CPSA ¶ 3.3. The CPSAs provide that "[a]s invoiced, Contract Pharmacy shall remit to [Defendant] the total amounts collected for each Covered Drug . . . less its Dispensing Fee calculated by [Defendant]." Compl. ¶ 55; Cloney's CPSA Ex. A ¶ 3.2; Willow Creek CPSA Ex. A ¶ 3.2; Pucci's CPSA Ex. A ¶ 3.2. After receiving payment from Plaintiffs, Defendant deducts an administrative fee and submits the remainder of the Remittance to the Covered Entity. Compl. ¶ 56.

Plaintiffs allege that Defendant erroneously calculated the Remittances by failing to account for "direct and indirect remuneration fees" ("DIR Fees") that are assessed against Plaintiffs by pharmacy benefit managers ("PBMs") for drugs dispensed under Medicare Part D, the outpatient prescription drug benefit for Medicare enrollees. Compl. ¶¶ 4–6, 57–58. DIR Fees are "clawed back" from Contract Pharmacies on Medicare Part D prescriptions after the "point of sale" reimbursement, which is the figure on which Defendant bases its calculation of a Remittance. Compl. ¶¶ 61–66. Thus, Plaintiffs allege, Defendant does not properly calculate the "total amount collected" by Plaintiffs in determining a Remittance as required by the CPSAs, because it fails to account for post-point-of-sale DIR Fees collected by PBMs that impact the "total amount collected," in turn impacting the Dispensing Fee retained by Plaintiffs. Compl. ¶¶ 66, 69, 71–72,

---

understanding between the Parties as to their obligations and, unless otherwise specified herein, may not be amended except by a writing signed by both Parties." Cloney's CPSA ¶ 8.6; Willow Creek CPSA ¶ 8.6; Pucci's CPSA ¶ 8.6.

75–82.  Accordingly, Plaintiffs allege that Defendant overcharges Plaintiffs, in breach of the CPSAs.  Compl. ¶¶ 5, 71, 73, 77, 82, 94, 97.

"The largest PBM by market share in the United States are non-parties Caremark, LLC and CaremarkPCS, LLC" (collectively, "Caremark").  Compl. ¶¶ 6, 59.  Caremark are Defendant's "sister companies."  Compl. ¶ 6.  Defendant and Caremark "are wholly owned by the parent company, nonparty CVS Health."  Compl. ¶ 7.  Plaintiffs allege that Defendant "is well aware of Caremark's DIR Fees," including because CVS Health is "one of the most prolific assessors of DIR Fees" and "CVS Health—not so incidentally the owner of the largest PBM in the nation—purchased [Defendant] in 2017, in or around the same time that DIR Fees came into prominence as a popular moneymaker for PBMs."  Compl. ¶ 67; *see also* Compl. ¶ 83 ("[Defendant] is capable of accounting for its sister company Caremark's DIR Fees in its Remittances but fails to do so.").

Plaintiffs each have a separate contractual relationship with Caremark through a Caremark Provider Agreement ("CPA"), which governs the provision of PBM services by Caremark to its network pharmacies such as Plaintiffs, who are defined as "Providers."  Def. Mem. 3; Pl. Mem. 6; Cloney's CPA; Willow Creek CPA; Pucci's CPA.  Each CPA incorporates by reference Caremark's Provider Manual ("CPM").  Def. Mem. 3; Cloney's CPA ¶ 11; Willow Creek CPA ¶ 11; Pucci's CPA ¶ 11.  At all relevant times, the CPM has contained an arbitration provision (the "Arbitration Clause").  *See* 2010 CPM ¶ 15.09; 2014 CPM 45–46; 2016 CPM 44–45; 2022 CPM ¶ 15.09.  As of the time of the filing of the Complaint, the Arbitration Clause states:

> Any dispute, claim or controversy between Provider and Caremark [including Caremark's current, future, or former employees, parents, subsidiaries, affiliates, agents, and assigns (collectively referred to in this Arbitration section as "Caremark")] including, but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, including any disputes regarding the interpretation, validity, scope, or applicability of this agreement to arbitrate, will be exclusively settled by arbitration.  This

arbitration provision applies to any dispute arising from events that occurred before, on, or after the effective date of this Provider Manual. . . .  The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of the agreement to arbitrate including, but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason. . . . Any such arbitration must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing.

2023 Arbitration Clause.  The CPM contains a provision providing that Caremark may amend a CPA, including the CPM, "by giving notice to Provider of the terms of the amendment and specifying the date the amendment becomes effective," and that if a Provider "submits claims to Caremark after the effective date of any notice or amendment, the terms of the notice or amendment is accepted by Provider and is considered part of the" CPA.  2022 CPM ¶ 15.07; *see also* 2010 CPM ¶ 15.07; 2014 CPM 45; 2016 CPM 44.[6]

## **PROCEDURAL HISTORY**

Plaintiffs commenced this action, filing the Complaint invoking the Court's diversity jurisdiction and asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, negligent performance, and an accounting.  Compl. ¶¶ 92–122.  Defendant filed a pre-motion letter in anticipation of its motion to dismiss the Complaint for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) or, in the alternative, for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).  [ECF No. 9].  Plaintiffs opposed Defendant's argument in substance, but consented to Defendant's filing of the proposed motion.  [ECF Nos. 9, 11].  Defendant now moves, pursuant to Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, and Rules 12(b)(1) and (3), to dismiss or to stay the action in favor of arbitration, or, in the alternative, to transfer the action to the District of Arizona pursuant to 28

---

[6] The CPAs contain a choice-of-law provision providing for the application of Arizona law.  *See* Cloney's CPA ¶ 13; Willow Creek CPA ¶ 13; Pucci's CPA ¶ 13.

U.S.C. § 1404(a). [ECF Nos. 18, 19 at 8]. Defendant filed a memorandum of law in support of its motion, along with a Declaration of Katherine Trefz and several exhibits. [ECF No. 19]. Plaintiffs filed a memorandum of law in opposition to the motion, accompanied by several exhibits, some of which Plaintiffs move to seal. [ECF Nos. 21, 22 ("Mot. Seal")].[7] Defendant filed a reply brief in further support of its motion. [ECF No. 23]. Both Defendant and Plaintiffs subsequently filed notices of supplemental authority [ECF Nos. 24 ("Def. Suppl. Auth."), 26 ("Pl. Suppl. Auth.")], to which the opposing party responded [ECF Nos. 25, 27].[8]

## LEGAL STANDARDS

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, embodies "a legislative recognition of 'the desirability of arbitration as an alternative to the complications of litigation.'" *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987) (quoting *Wilko v. Swan*, 346 U.S. 427, 431 (1953)); *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 653 (2d Cir. 2004) ("Federal policy strongly favors the enforcement of arbitration agreements."). To achieve its goal, the FAA "provides that arbitration clauses in commercial contracts 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting 9 U.S.C. § 2). Accordingly, the FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). A party may petition the

---

[7] Plaintiffs filed redacted versions of these exhibits on the public docket. *See infra* Part II.

[8] Following the filing of the present motion, the Court denied Plaintiffs' request for an initial pretrial conference [ECF No. 28] and granted Defendant's request to stay discovery pending the Court's resolution of the present motion to dismiss or to stay [ECF No. 29], consistent with the weight of authority in this Circuit. [ECF No. 30]. *See Intertec Contracting v. Turner Steiner Int'l, S.A.*, No. 98 CIV. 9116 (CSH), 2001 WL 812224, at *7 (S.D.N.Y. July 18, 2001) (noting that a stay of discovery while a motion to compel arbitration is pending "is the general practice of district courts").

court "for an order directing that such arbitration proceed in the manner provided for in such

agreement." 9 U.S.C. § 4.  Further, pursuant to Section 3 of the FAA,

> If any suit or proceeding be brought in any of the courts of the United States upon
> any issue referable to arbitration under an agreement in writing for such arbitration,
> the court in which such suit is pending, upon being satisfied that the issue involved
> in such suit or proceeding is referable to arbitration under such an agreement, shall
> on application of one of the parties stay the trial of the action until such arbitration
> has been had in accordance with the terms of the agreement.

9 U.S.C. § 3.

"Arbitration is . . . a creature of contract. . . . determined entirely by an agreement between

the parties." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 104 (2d Cir.

2006).  "[A]s with any other contract, the parties' intentions control, but those intentions are

generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-

Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

Courts in this Circuit follow a two-part test to determine whether claims are subject to

arbitration, considering "(1) whether the parties have entered into a valid agreement to arbitrate,

and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement."

*In re American Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).  "The party seeking

to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was

made." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022).  If the

movant overcomes this burden, "[b]efore addressing the second inquiry, [the court] must also

determine who—the court or the arbitrator—properly decides the issue." *In re American Exp.*,

672 F.3d at 128.  While the question of "whether the particular dispute is subject to an arbitration

agreement is typically an issue for judicial determination," an exception to that general rule applies

if the arbitration agreement "clearly and unmistakably elects to have the resolution of the

arbitrability of the dispute decided by the arbitrator." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184,

191 (2d Cir. 2019) (internal quotation marks omitted).  Should the court find that the issue of arbitrability is for its own determination, at the second step, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

"In deciding motions to compel [arbitration], courts apply a standard similar to that applicable for a motion for summary judgment."  *Nicosia*, 834 F.3d at 229 (internal quotation marks omitted); *accord Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019).  "The summary judgment standard requires a court to consider all relevant, admissible evidence submitted by the parties and . . . draw all reasonable inferences in favor of the non-moving party."  *Nicosia*, 834 F.3d at 229 (internal quotation marks omitted).  "Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the Court] may rule on the basis of that legal issue and avoid the need for further court proceedings."  *Starke*, 913 F.3d at 288 (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011)).

## DISCUSSION

### I.    Motion to Dismiss or to Stay in Favor of Arbitration

The Court first considers whether Defendant has met its burden of showing, at the initial step of the inquiry on a motion to compel arbitration (or to dismiss or stay in favor thereof), that "the parties have entered into a valid agreement to arbitrate."  *In re American Exp.*, 672 F.3d at 128; *Zachman*, 49 F.4th at 101–02.  The Court finds that Defendant has met its burden and that the parties have entered into a valid agreement to arbitrate.  Because that arbitration agreement delegates all issues of arbitrability to the arbitrator, the Court does not proceed to address whether

the scope of the arbitration agreement encompasses the present dispute at the second step. This case must be stayed in favor of arbitration.[9]

### A. The Parties Entered Into a Valid Agreement to Arbitrate

The parties do not dispute that a valid arbitration agreement exists between each Plaintiff and Caremark. *See* Pl. Mem. 6–9. Each Plaintiff executed a CPA with Caremark, and each CPA incorporated the CPM. *See* Cloney's CPA ¶ 11; Willow Creek CPA ¶ 11; Pucci's CPA ¶ 11. The version of the CPM in effect at the time of Plaintiffs' filing of the Complaint states, in relevant part:

> Any dispute, claim or controversy between Provider and Caremark [*including Caremark's current, future, or former* employees, parents, subsidiaries, *affiliates*, agents, and assigns . . . ] including, but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, including any disputes regarding the interpretation, validity, scope, or applicability of this agreement to arbitrate, will be exclusively settled by arbitration.

2023 Arbitration Clause (emphasis added).[10]

Defendant, by Plaintiffs' own allegations, is an "affiliate" of Caremark, because it is Caremark's "sister company" under the common ownership of CVS Health. *See* Compl. ¶¶ 6–7, 60, 67, 83. Even though CVS Health acquired Defendant in 2017, after Cloney's and Pucci's executed their CPAs, *see* Cloney's CPA 3; Pucci's CPA 3, the Arbitration Clause encompasses "Caremark's current, future, or former employees, parents, subsidiaries, affiliates, agents, and assigns." 2023 Arbitration Clause; *see also* 2016 CPM 44. To the extent that the CPM in effect at the time of any Plaintiff's execution of its CPA may have contained an arbitration clause with

---

[9] The Arbitration Clause calls for arbitration to take place in Arizona. *See* 2023 Arbitration Clause; *infra* n.14.

[10] Defendant establishes that the CPM has contained some version of the Arbitration Clause since at least 2010. *See* 2010 CPM; 2014 CPM; 2016 CPM; 2022 CPM; 2023 Arbitration Clause; *see also Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1026 (9th Cir. 2022) ("The 'Arbitration' subsection in every version of the Provider Manual has instructed that all disputes arising in connection with the agreement will be resolved in arbitration.").

slightly different verbiage—*i.e.*, that the 2014 CPM, in effect at the time Cloney's signed its CPA, did not contemplate Caremark's "future" affiliates, *see* Def. Mem. 12–14—Plaintiffs accepted amendments to the Arbitration Clause subsequent to Plaintiffs' signing of the CPAs, but prior to CVS Health's acquisition of Defendant, that did include "future" "affiliates." The CPM provides that Caremark may amend the CPA, including the CPM, by providing notice of the amendment and specifying its effective date, and that Plaintiff accepts the amendment and it becomes part of the CPA if Plaintiff submits claims to Caremark after the date of the amendment. *See* 2014 CPM 45; 2016 CPM 44; 2022 CPM ¶ 15.07. Plaintiffs do not contest that they continued to accept reimbursements from Caremark after the date of any applicable amendments. *See* Def. Mem. 13–14. Specifically, therefore, Cloney's accepted the 2016 version of the Arbitration Clause, which encompasses "future" "affiliates" of Caremark and went into effect prior to CVS Health's acquisition of Defendant in 2017. 2016 CPM 44; *see* Compl. ¶ 67. All Plaintiffs thus entered an agreement to arbitrate with Caremark, which, pursuant to the plain language of the Arbitration Clause, includes Caremark's "affiliates"—*i.e.*, Defendant, Caremark's sister company. Plaintiffs do not dispute the formation or validity of the Arbitration Clause or that Defendant is an "affiliate" of Caremark. Accordingly, the Court finds that the parties have entered into a valid agreement to arbitrate.

### B.  The Arbitration Clause Delegates Issues of Arbitrability to the Arbitrator

Having determined that the parties entered a valid agreement to arbitrate, the Court must next consider "whether the dispute at issue comes within the scope of the arbitration agreement," *In re American Exp.*, 672 F.3d at 128, *unless* the agreement "clearly and unmistakably elects to

have the resolution of the arbitrability of the dispute decided by the arbitrator." *Bucsek*, 919 F.3d at 191.

The Arbitration Clause here "clearly and unmistakably" delegates issues of arbitrability to the arbitrator. *Id.* It provides that "[a]ny" disputes between the parties, "including any disputes regarding the interpretation, validity, scope, or applicability of this agreement to arbitrate, will be exclusively settled by arbitration." 2023 Arbitration Clause. It also states that "[t]he arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of the agreement to arbitrate including, but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason." 2023 Arbitration Clause. "This language clearly and unmistakably evinces an intent to submit any disputes over the interpretation of the" Arbitration Clause, including whether it is applicable to the claims in this lawsuit, "to arbitration. Hence, the parties agreed, unequivocally, to submit disputes of this type to arbitration." *All. Bernstein Inv. Rsch. & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 127 (2d Cir. 2006); *see Marino v. CVS Health*, 698 F. Supp. 3d 689, 696 (S.D.N.Y. 2023) (arbitration agreement that encompassed "disputes arising out of or relating to the validity, enforceability or breach of" the arbitration agreement "clearly and unmistakably elects to have the resolution of the arbitrability of the dispute decided by the arbitrator," not the court (quoting *Bucsek*, 919 F.3d at 191)); *Cimillo v. Experian Info. Sols., Inc.*, No. 21 CV 9132 (VB), 2023 WL 2473403, at *8 (S.D.N.Y. Mar. 13, 2023) (arbitration provision stating that "the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision" constitutes a "clear[] and unmistakabl[e]" delegation of arbitrability to the arbitrator (quoting *Bucsek*, 919

F.3d at 191)); *see also Caremark*, 43 F.4th at 1026 (finding that the Arbitration Clause includes a delegation clause).

"When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract," "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68, 71 (2019); *see Micheli & Shel, LLC v. Grubhub Inc.*, 588 F. Supp. 3d 483, 490 (S.D.N.Y. 2022) ("[T]he Supreme Court has repeatedly held that courts must analyze the validity of a delegation provision on its own terms, without regard to whether the underlying dispute is subject to arbitration."); *accord Hidalgo v. Amateur Athletic Union of United States, Inc.*, 468 F. Supp. 3d 646, 661 (S.D.N.Y. 2020). Accordingly, because the parties have entered into a valid agreement to arbitrate and the Arbitration Clause delegates questions of the arbitrability of particular disputes to the arbitrator, the Court must defer from hearing the case and instead refer this matter to arbitration. *See* 9 U.S.C. § 3.

### C. Plaintiffs' Arguments Do Not Convince the Court to Determine the Arbitrability of this Dispute

Plaintiffs raise several arguments as to why the Court should not refer this matter, including any issues concerning its arbitrability, to arbitration. The Court is not persuaded by Plaintiffs' arguments, which improperly conflate the first and second steps of the court's inquiry on this motion, contrary to Supreme Court precedent. Plaintiffs' cited authorities in support of its arguments are distinguishable.

#### i. The CPSAs Do Not Displace the Arbitration Clause

First, Plaintiffs argue that the Court cannot find that the parties entered into a valid agreement to arbitrate because Plaintiffs' claims in this case arise under the CPSAs, not the CPAs.

*See* Pl. Mem. 9.  Plaintiffs argue that "where more than one contract exists, and the dispute specifically arises under a contract that does not contain an arbitration provision. . . . the Court must determine which contract governs the dispute, and whether arbitration of the dispute is consistent with the parties' intent."  Pl. Mem. 9.  Plaintiffs contend that the CPSAs govern this dispute and that those contracts do not evince an intent to arbitrate disputes arising under them, such as Plaintiffs' claims involving the erroneous calculation of Remittances.  *See* Pl. Mem. 9–14.  The CPSAs do not contain arbitration provisions, nor do they contain forum selection clauses.  *See* Cloney's CPSA; Willow Creek CPSA; Pucci's CPSA.  Plaintiffs cite several cases for the proposition that, in these circumstances, the Court must find that the parties did not form an agreement to arbitrate the present dispute.  Each of Plaintiffs' cited authorities is distinguishable.

In Plaintiffs' first case, *Rosen v. Mega Bloks Inc.,* No. 06 CIV 3474 LTS GWG, 2007 WL 1958968 (S.D.N.Y. July 6, 2007), *report and recommendation adopted in part*, No. 06CIV.3474(LTS)(GWG), 2008 WL 2810208 (S.D.N.Y. July 21, 2008), the court was faced with two competing agreements—an employment agreement that contained an arbitration clause, and a stock purchase agreement that contained a forum selection clause requiring the parties to submit to the jurisdiction of the federal courts in New York.  *See id.* at *2.  The court held that the arbitration clause in the employment agreement could not be held to apply to disputes arising under the stock purchase agreement, because "[t]he mere fact that a document is an 'integral part' of a larger transaction does not mean that any provision contained in that document must be applied to all other documents that are part of the same transaction."  *Id.* at *5, *7.

In so holding, the *Rosen* court relied in part on the narrow scope of the relevant arbitration clause—which applied *only* to "dispute[s] arising out of or relating to" the employment agreement. *Id.* at *2.  The court distinguished cases in which "the breadth of the latter contract's arbitration

clause" permitted "claim[s] arising under one contract . . . to come within the scope of an arbitration clause in another contract." *Id.* at *5. The Arbitration Clause here falls into this broad category, the scope of which conceivably encompasses a "claim arising under [another] contract," *id.*, because it applies to "[a]ny dispute, claim or controversy between" the parties to it, "including, but not limited to, disputes in connection with, arising out of, or relating in any way to, the [CPA] or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks." 2023 Arbitration Clause. The *Rosen* court additionally found that the existence of a forum selection clause in the stock purchase agreement supported its conclusion that the parties did not intend to arbitrate claims arising under that agreement, because "consistent inclusion of forum selection clauses in the . . . agreements that did not contain an arbitration clause . . . suggests that the parties assumed that claims arising under these agreements would be heard in a court, not as part of an arbitration." *Rosen*, 2007 WL 1958968, at *6. Here, however, the CPSAs do not contain a forum selection clause or evince any intent with respect to the parties' chosen forum. Moreover, Plaintiffs concede that there is *an* agreement to arbitrate. The only question is the *scope* of the arbitration agreement, which the arbitration agreement clearly delegates to the arbitrator. *See* 2023 Arbitration Clause. Accordingly, the Court does not find *Rosen* to be on all fours with the facts in this case.[11]

Plaintiffs also rely on *Snyder v. Wells Fargo Bank, N.A.*, No. 11 CIV. 4496 SAS, 2011 WL 6382707 (S.D.N.Y. Dec. 19, 2011), in which the plaintiff raised claims under two "related but distinct contract[s]" between the parties, one that contained an arbitration clause and one that did

---

[11] The Court is not persuaded by Plaintiffs' citation to an out-of-District case, *Slaughter v. National Railroad Passenger Corp.*, 460 F. Supp. 3d 1 (D.D.C. 2020), *see* Pl. Mem. 11, for similar reasons. In *Slaughter*, both competing contracts that did not call for arbitration contained forum selection clauses by which the parties consented to the exclusive jurisdiction of the federal courts in the District of Columbia. *See id.* at *10 (citing *Rosen*, 2007 WL 1958968, at *6).

not. *Id.* at *4.  Although the court found the arbitration clause to be broad in that it covered "disputes between the parties to this agreement" (notwithstanding the absence of "any" or "all"), it held that such a clause could "not be[] held to include claims arising from a distinct contract not providing for arbitration." *Id.* ("the parties' rights under each contract can be fully considered on their own without regard to the other contract and there is no contractual commitment to arbitrate under the [relevant agreement]").  The court noted that the fact that one contract "is not inconsistent with an agreement to arbitrate does not mandate a different result," because although the contract "does not explicitly require adjudication by a court, it is silent with respect to the appropriate forum." *Id.* at *5 ("[T]he omission of an arbitration clause in the [contract] suggests that [plaintiff] did not agree to arbitrate disputes under the [contract].").  The court bifurcated the case, referring the claims arising under the contract containing the arbitration clause and retaining the others.  *See id.*

*Snyder* (like *Rosen*) was decided before the Supreme Court's decision in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019), and its applicability to the present case must be considered with the gloss of that opinion in mind.  In *Henry Schein*, the Supreme Court considered the "wholly groundless" exception that had been developed by several Courts of Appeals, in which "[e]ven when the parties' contract delegates the threshold arbitrability question to an arbitrator, . . . the court rather than an arbitrator should decide the threshold arbitrability question if, under the contract, the argument for arbitration is wholly groundless." *Id.* at 68.  The Court found this exception to be inconsistent with the text of the FAA and its precedent, which requires courts to "interpret the contract as written." *Id.*  "When the parties' contract delegates the arbitrability question to an arbitrator, . . . a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies

15

to a particular dispute is wholly groundless." *Id.* Thus, *Henry Schein* made clear that "courts must analyze the validity of a delegation provision on its own terms, without regard to whether the underlying dispute is subject to arbitration." *Micheli & Shel*, 588 F. Supp. 3d at 490–91.

Nonetheless, the Second Circuit has stated that "*Henry Schein* does not prohibit 'a court considering whether an arbitration agreement confers authority over arbitrability on the arbitrators from considering whether the agreement calls for arbitration of the [particular] dispute.'" *LAVVAN, Inc. v. Amyris, Inc.*, No. 21-1819, 2022 WL 4241192, at \*2 (2d Cir. Sept. 15, 2022) (cleaned up) (quoting *Bucsek*, 919 F.3d at 195). Courts "properly addressing the delegation issue" are still to "apply[] ordinary contract principles" and "consider all pertinent evidence, including evidence that the parties intended to litigate a particular category of disputes." *Id.* (cleaned up) (quoting *Bucsek*, 919 F.3d at 196). But here, as noted above, Plaintiffs have adduced no such evidence that the parties "intended to litigate" disputes arising under the CPSAs. *Contra id.* (noting that the relevant agreement did not clearly and unmistakably delegate arbitrability because its text only "commits some types of disputes to litigation," and thus "does not express a broad intent to arbitrate 'all aspects of all disputes'" (quoting *Bucsek*, 919 F.3d at 191)).

To the contrary, here the Arbitration Clause "is broad and expresses the intent to arbitrate all aspects of all disputes," *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318–19 (2d Cir. 2021): it covers "[a]ny dispute, claim or controversy between" those subject to it, "including, but not limited to, disputes in connection with, arising out of, or *relating in any way to, the* [*CPA*] *or to* [*Plaintiff*]*'s participation in one or more Caremark networks* or exclusion from any Caremark networks, including *any* disputes regarding the interpretation, validity, *scope*, or *applicability of this agreement to arbitrate*." 2023 Arbitration Clause (emphasis added). Such a broad clause

16

"constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *DDK Hotels*, 6 F.4th at 318–19.

Plaintiffs point to several features of the CPSAs as "[i]rreconcilabl[y] differen[t]" from the CPAs to attempt to inject ambiguity and override this plain delegation.[12]  Pl. Mem. 6.  Plaintiffs argue that the CPSAs and CPAs involve different parties and subject matter.  *See* Pl. Mem. 6–7. However, Plaintiffs' allegations in this case necessarily implicate the parties' relationship with Caremark, because that relationship is the basis for Plaintiffs' allegation that Defendant was aware of the DIR Fees that it intentionally failed to account for in the Remittances, in violation of the CPSAs.  *See* Compl. ¶¶ 67, 83; Def. Reply. 1–3.  Thus, the CPAs bear a non-trivial nexus to the subject matter of Plaintiffs' claims for breach of the CPSAs.

Plaintiffs also argue that the CPAs and the CPM do not incorporate or refer to the CPSAs, and vice versa.  *See* Pl. Mem. 7.  But, as discussed above, *see* Section I.A, this is not dispositive since each Plaintiff has entered into an agreement to arbitrate (via the CPA) and that agreement applies broadly to "[a]ny" dispute between the parties, including disputes "relating *in any way* to, the [CPA]."  2023 Arbitration Clause (emphasis added).

Plaintiffs additionally argue that the CPSAs contain a merger clause that does not permit their amendment "except by a writing signed by both Parties."  Pl. Mem. 7.  But this argument is irrelevant here, because the CPSAs do not contain an alternative forum provision that the Arbitration Clause conflicts with or purports to amend or alter.  Moreover, this argument is flawed

---

[12] Because Defendant is not a named party to the Willow Creek CPSA, *see supra* n.4, Plaintiffs' arguments are particularly weak with respect to Willow Creek, as there is no "competing" agreement between Willow Creek and Defendant.  Whether Willow Creek may maintain a contract claim against Defendant is not an issue presently before the Court.

in part because at least one Plaintiff executed the CPSA *after* it executed the CPA incorporating the CPM and its Arbitration Clause.  *See* Cloney's CPA 3; Cloney's CPSA 15.

Plaintiffs also point to the omission of a forum selection clause in the CPSAs as evidence of a conflict with the CPAs that precludes the arbitrability of disputes arising under the CPSAs. *See* Pl. Mem. 7–8.  As the Court will further discuss below, however, this omission does not create a conflict requiring the Court's intervention, which would impermissibly bleed into the determination of scope that is delegated to the arbitrator under the Arbitration Clause.  To the extent that the *Snyder* court found otherwise under somewhat analogous circumstances, *see Snyder*, 2011 WL 6382707, at *5, the decision is not binding on this Court, and the Court respectfully disagrees with its analysis: the omission of an arbitration clause from a related agreement is not strong evidence that the parties *did not* intend to arbitrate disputes, particularly when the agreement does not designate *any* forum for the resolution of disputes.  *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

Finally, although the designation of controlling law as Oregon law in the CPSAs, and Arizona law in the CPAs, is perhaps a conflict[13], *see* Pl. Mem. 8, this, too, is an issue that is appropriately resolved by the arbitrator.  *See* Def. Reply 9.  Accordingly, none of these features of the CPSAs "create ambiguity as to the parties' intent" to submit the question of arbitrability to the arbitrator, as provided for in the Arbitration Clause.  *LAVVAN*, 2022 WL 4241192, at *2 (quoting *DDK Hotels*, 6 F.4th at 318).

The Supreme Court's recent opinion in *Coinbase, Inc. v. Suski*, __ U.S. __, 144 S. Ct. 1186 (2024), which was decided during the pendency of this motion and raised by Plaintiffs in a notice

---

[13] Each CPA requires that *it* "be construed, governed, and enforced in accordance with the laws of the State of Arizona." Cloney's CPA ¶ 13; Willow Creek CPA ¶ 13; Pucci's CPA ¶ 13.  But, as discussed, the Arbitration Clause applies more broadly than disputes arising under the CPA.

of supplemental authority, *see* Pl. Suppl. Auth., is not to the contrary and, in fact, supports the Court's conclusion. In *Coinbase*, the parties executed two contracts: one containing an arbitration provision with a delegation clause, another containing a forum selection clause providing for litigation in California courts. *Id.* at 1190–91. The Supreme Court considered the question of, in such circumstances, "who—a judge or an arbitrator—should decide whether a subsequent contract supersedes an earlier arbitration agreement that contains a delegation clause." *Id.* at 1192. The Court held that "where . . . parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." *Id.* at 1194.

*Coinbase* is distinguishable from the present case. The contracts in *Coinbase* contained competing provisions regarding the parties' choice of forum—one agreement designated arbitration for the resolution of disputes, the other designated the courts. Indeed, in *Coinbase*, "the question whether these parties agreed to arbitrate arbitrability can be answered only by determining which contract applies," which required "hom[ing] in on the conflict between the delegation clause in the first contract and forum selection clause in the second" to determine "whether the parties agreed to send the given dispute to arbitration." *Id.* at 1193. The conflict between the arbitration clause and the forum selection clause was essential to the Court's analysis. The analysis of earlier district court cases such as *Rosen* and *Slaughter*—both of which involved competing arbitration and forum selection clauses—is thus consistent with *Coinbase*'s holding.

Here, by contrast, no provision of the competing contract—the CPSA—"either explicitly or implicitly send[s] arbitrability disputes to the courts." *Id.* at 1194. "[T]he parties do not have multiple agreements regarding who should decide arbitrability of disputes" among them, including disputes arising under the CPSAs. *See New York Knicks, LLC v. Maple Leaf Sports & Ent. Ltd.*,

No. 23-CV-7394 (JGLC), 2024 WL 3237563, at *7 n.3 (S.D.N.Y. June 28, 2024); *see also Storz, Tr. of I. Shane Storz Tr. v. S. Airways Corp.*, No. 4:23-CV-01496-SEP, 2024 WL 3652919, at *4 (E.D. Mo. Aug. 5, 2024) (finding *Coinbase* inapposite because it "involve[d] [a] contract[] that required the parties to litigate disputes in court," and where one contract "is silent on how the parties must resolve future disputes, it can coexist with the . . . arbitration provision" in the other).

Finally, the Court need not consider, in this case, whether the Arbitration Clause presents the problem of the so-called "infinite arbitration clause" that, "[i]f enforced according to [its] terms, . . . would require arbitration of *any* claims between defendants and . . . Plaintiffs, including claims without any nexus to the agreements containing the clauses." *Davitashvili v. Grubhub Inc.*, No. 20-CV-3000 (LAK), 2023 WL 2537777, at *10 (S.D.N.Y. Mar. 16, 2023); *see McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 279 (S.D.N.Y. 2021) (holding, "whether as a matter of contract formation or unconscionability," "that the Arbitration Provision does not apply to Plaintiffs' claims to the extent that they lack any nexus to the" agreement in which it was contained). That is because "this dispute has a plain nexus to" the CPAs that contain the Arbitration Clause. *New York Knicks*, 2024 WL 3237563, at *9. As explained above, Plaintiffs' claims center, in part, on Defendant's relationship with Caremark, because that relationship supports Plaintiffs' allegation that Defendant was aware of the DIR Fees that it intentionally failed to account for in the Remittances in violation of the CPSAs. *See* Compl. ¶¶ 67, 83

At bottom, Plaintiffs improperly attempt to inject the second-step issue of scope—whether the Arbitration Clause applies to disputes arising under the CPSAs—into the Court's first-step inquiry of contract formation. *See Henry Schein*, 586 U.S. at 68; *Micheli & Shel*, 588 F. Supp. 3d at 490–91; Def. Reply 7. However, because the broad Arbitration Clause here applies to the parties to this case, covers "[a]ny dispute, claim or controversy between" them, and delegates all issues

of arbitrability to the arbitrator, *see* 2023 Arbitration Clause—and the CPSAs do not alter or supplant that breadth or delegation—the Court must refer this matter to arbitration without further considering whether the Arbitration Clause applies to the claims raised in this lawsuit. *See Perry St. Software, Inc. v. Jedi Techs., Inc.*, No. 20-cv-4539, 2020 WL 6064158, at *8 n.2 (S.D.N.Y. Oct. 14, 2020) ("This argument [regarding the scope of the arbitration agreement] necessarily requires an interpretation of the arbitration agreement, which—as the agreement states—is an issue reserved for the arbitrator."); *see also Mrinalini, Inc. v. Valentino S.p.A.*, No. 1:22-CV-2453 (MKV), 2023 WL 2307479, at *4–*5 (S.D.N.Y. Mar. 1, 2023), *reconsideration denied*, No. 1:22-CV-2453 (MKV), 2023 WL 3847292 (S.D.N.Y. June 6, 2023).

      ii.      *Whether Defendant Can Enforce the Arbitration Clause is an Issue Delegated to the Arbitrator*

Plaintiffs next argue that Defendant cannot enforce the Arbitration Clause because Defendant is not a party to the CPAs. *See* Pl. Mem. 15–22. But the issue of enforceability, too, is an issue of arbitrability that the Arbitration Clause clearly and unmistakably delegates to the arbitrator. *See* 2023 Arbitration Clause ("The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, *enforceability*, or formation of the agreement to arbitrate . . . ." (emphasis added)); *Doctor's Assocs., LLC v. Tripathi*, 794 F. App'x 91, 94 (2d Cir. 2019) ("With respect to the enforceability of the arbitration agreement, we agree with the district court that the arbitration agreement clearly and unmistakably delegated this issue for the arbitrator's determination in the first instance."); *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1299 (11th Cir. 2022) (some "arbitrability questions are about the 'validity' or 'enforceability' of an arbitration agreement—*i.e.*, whether the parties have entered into a legally operative arbitration agreement that is enforceable under law"); *see also Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) ("a nonsignatory's ability to enforce an arbitration agreement

concern[s] a question of arbitrability"); *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) ("Whether a particular arbitration provision may be used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability.").

Plaintiffs contend that in this Circuit, "[i]n order to decide whether arbitration of arbitrability [as to a non-signatory] is appropriate, a court must first determine whether the parties have a sufficient relationship to each other and to the rights created under the agreement." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 209 (2d Cir. 2005); Pl. Mem. 15–17 & n.12; *see also Gerszberg v. Li & Fung (Trading) Ltd.*, 215 F. Supp. 3d 282, 290 (S.D.N.Y. 2016). But in the cases Plaintiffs cite, the arbitration clauses did not "explicitly vest[] rights to arbitrate," *Citadel Servicing Corp. v. Castle Placement, LLC*, 431 F. Supp. 3d 276, 287–88 (S.D.N.Y. 2019), including as to issues of arbitrability and specifically enforceability, in a party's "current, future, or former employees, parents, subsidiaries, affiliates, agents, and assigns." 2023 Arbitration Clause; *see Contec*, 398 F.3d at 208; *The Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11, 12–13 (2d Cir. 2012); *cf. Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC*, 289 F. Supp. 3d 457, 465 (S.D.N.Y. 2018) (noting that "[c]ourts have generally found that agreements *that do not mention or reference a particular non-signatory* do not clearly or unmistakably evidence an agreement by that non-signatory to have an arbitrator determine whether the agreement is arbitrable" (emphasis added) (quoting *McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, No. 14 Civ. 6633 (KBF), 2015 WL 144190, at *5 (S.D.N.Y. Jan. 12, 2015))). Here, "[i]n sharp contrast," Defendant is "explicitly vested with the right to have the arbitrator decide whether they are [affiliates] of [Caremark], and therefore entitled to proceed in arbitration despite being non-signatories to the" CPA and its Arbitration Clause. *Citadel*, 431 F. Supp. 3d at 288, 290

(finding that plaintiff's reliance on the relational sufficiency test was "misplaced" where contract explicitly provided for arbitration of arbitrability including as to non-signatory "agents"); *see also McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771, 772 (2d Cir. 1992) ("[U]nder general contract principles, we may deem non-signatories to fall within the scope of an arbitration agreement where that is the intent of the parties.").

In any event, even if the Court were to conduct the relational sufficiency analysis that Plaintiffs urge, for the reasons explained above, the Court would find that the circumstances of this case (including the allegations in Plaintiffs' Complaint) "demonstrate that a sufficient relationship exist[s]" between Plaintiffs, Defendant, and Caremark, the contracts they signed, including the CPSAs and the CPAs, and the issues in this case, to permit Defendant to seek arbitration—"even if, in the end, an arbitrator were to determine that the dispute itself is not arbitrable because [Defendant] cannot claim rights under the" CPA or the Arbitration Clause. *Contec*, 398 F. 3d at 209; *see also Doe v. Trump Corp.*, 6 F.4th 400, 411 n.7 (2d Cir. 2021) (distinguishing *Contec* from *Republic of Iraq*).  Accordingly, the issue of whether Defendant may enforce the Arbitration Clause is a subject to be determined by the arbitrator upon the referral of this case to arbitration.

### D.  *The Case Is Stayed Pending Arbitration*

The sole matter remaining for the Court's determination with respect to the impact of the Arbitration Clause is whether to dismiss, stay, or transfer this case in favor of arbitration.[14]  The

---

[14] The Court does not have clear authority to compel arbitration outside of this District.  Although the Second Circuit has not decided the question of whether district courts may compel arbitration outside of their district, district courts in this Circuit "have routinely held" that they may not.  *Abuda v. Strongblock*, No. 22-CV-10869-LTS-BCM, 2023 WL 6294205, at *6 (S.D.N.Y. Sept. 27, 2023); s*ee Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 269 F. Supp. 2d 356, 363–64 (S.D.N.Y. 2003) ("[T]he Court's authority to compel arbitration under FAA § 4 is restricted to arbitration proceedings that occur within this District."); *AKS Trade Co., LLC v. Americap Direct Corp.*, No. 21 CIV. 9364 (KPF), 2022 WL 1184203, at *4 n.8 (S.D.N.Y. Apr. 21, 2022) ("join[ing] the majority view in finding that [the court] lacks the power to compel the parties to arbitrate in a different jurisdiction" and collecting cases).  Thus, when a party seeks to enforce an agreement to arbitrate that calls for arbitration outside of the district in which suit has been filed, that

FAA requires a district court, "on application of one of the parties," to stay an action "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration." 9 U.S.C. § 3. The Second Circuit has held that "the text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration *and a stay requested.*" *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) (emphasis added). This holding was recently approved by the Supreme Court. *See Smith v. Spizzirri*, 601 U.S. 472, 475 n.1, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."); Def. Suppl. Auth.

Here, Defendant requests a stay or transfer only in the alternative to dismissal. *See* Def. Mem. 6 (arguing, in the first instance, that dismissal is appropriate). Plaintiffs did not request a stay preferable to dismissal should the Court refer the matter to arbitration, contending only that the Court should deny Defendant's motion in its entirety. *See* Pl. Mem. 22–23. In the wake of *Katz*, there has been much debate about whether a stay is mandatory under the FAA even when no stay is requested. *Compare Bissonnette v. LePage Bakers Park St., LLC*, 49 F.4th 655, 664 (2d Cir. 2022) (Jacobs, J., concurring) ("[T]he FAA mandates a stay whether or not a party requests one."), *cert. granted*, 144 S. Ct. 479 (2023), *and vacated and remanded on other grounds*, 601 U.S. 246 (2024), *with id.* at 674 (Pooler, J., dissenting) ("[W]here a party does not request a stay . . . a district court retains the authority to dismiss the action."). Certain courts in this District have held that, under the circumstances present here, a court "has discretion in determining whether to

---

party may instead, as Defendant does here, seek dismissal, a stay, or transfer in favor of arbitration. *See Abuda*, 2023 WL 6294205, at *6–*7 (dismissing without prejudice in favor of arbitration in the Cayman Islands); *Aminoff & Co. LLC v. Parcel Pro, Inc.*, No. 21-CV-10377 (AT)(KHP), 2022 WL 987665, at *6 (S.D.N.Y. Apr. 1, 2022) ("referral to arbitration [pursuant to 9 U.S.C. § 3] and stay of the litigation is appropriate where, as here, the arbitration clause provides for arbitration to take place outside of this district"); *AKS Trade Co.*, 2022 WL 1184203, at *6 (denying motion to compel arbitration and transferring case pursuant to forum selection clause in arbitration agreement).

stay or dismiss the case pending arbitration." *Worthington v. JetSmarter, Inc.*, 18-cv-12113, 2019 WL 4933635, at *8 (S.D.N.Y. Oct. 7, 2019); *see also Rost v. Lib. Coca-Cola Beverages*, LLC, No. 20-CV-10559-VB, 2021 WL 3723092, at *5 (S.D.N.Y. Aug. 23, 2021) ("When, as here, a defendant requests that an action be dismissed and requests a stay in the alternative, the Court 'has discretion in determining whether to stay or dismiss the case pending arbitration.'" (quoting *Worthington*, 2019 WL 4933635, at *8)); *Abuda*, 2023 WL 6294205, at *6–*7 (dismissing case in favor of arbitration in the Cayman Islands where neither party requested a stay).

However, the Second Circuit has counseled that, generally, "courts should stay litigation pending arbitration to avoid converting an otherwise-unappealable interlocutory stay order into an appealable final dismissal order, thus enabling parties to proceed to arbitration directly." *Dylan 140 LLC v. Figueroa*, 982 F.3d 851, 858 n.2 (2d Cir. 2020) (cleaned up) (quoting *Katz*, 794 F.3d at 345–46); *see Smith*, 601 U.S. at 478 ("The [FAA's] choice to provide for immediate interlocutory appeals of orders denying—but not of orders granting—motions to compel arbitration is consistent with Congress's purpose in the FAA to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." (cleaned up)); *cf. Singh v. Meetup LLC*, No. 23-CV-9502 (JPO), 2024 WL 3904799, at *7 (S.D.N.Y. Aug. 22, 2024) (staying case pending arbitration in consideration of *Smith*, even though party did not explicitly request a stay). Moreover, "[a] stay is particularly appropriate where, as here, the parties must arbitrate the question of arbitrability, since any claims that the arbitrator determines are not arbitrable would proceed before this Court." *Kuehne + Nagel Inc. v. Hughes*, No. 21-cv-8470, 2022 WL 2274353,

at *8 (S.D.N.Y. June 23, 2022); *see also Aminoff*, 2022 WL 987665, at *6.  Accordingly, the Court

stays all proceedings in this action pending arbitration.

## II.    Motion to Seal

Plaintiffs move, unopposed, to seal unredacted versions of the CPSAs that were

inadvertently filed on the docket as exhibits to Plaintiffs' memorandum of law in opposition to

Defendant's motion.  Mot. Seal.  [*See* ECF Nos. 20-1, 20-2, 20-3].  Upon realizing their error,

Plaintiffs promptly notified the Court, which temporarily sealed the exhibits.  Plaintiffs then filed

redacted versions of the exhibits that they assert are consistent with the narrowly tailored redaction

order (the "Sealing Order") entered by the District Judge overseeing the initial, sealed iteration of

this case.[15]  *See* Mot. Seal 2–3.

The Court has reviewed the unredacted and redacted CPSAs and finds Plaintiffs' redactions

to be consistent with the Sealing Order, "namely[,] information related to payment and formulas

used for payment purposes."  Sealing Order 2.  Accordingly, Plaintiffs' motion to seal is

GRANTED and the unredacted CPSAs filed at docket entries 20-1, 20-2, and 20-3 shall remain

sealed until any further order of the Court.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss or to stay in favor of arbitration

is GRANTED and this case is STAYED pending arbitration.  Plaintiffs' motion to seal the exhibits

to Plaintiffs' memorandum of law in opposition to Defendant's motion is GRANTED and the

documents filed at docket entries 20-1, 20-2, and 20-3 shall remain sealed until any further Order

---

[15] This case was initiated as a sealed miscellaneous matter.  *See ABC v. DEF*, No. 1:23-mc-00207-VSB (S.D.N.Y. June 23, 2023).  Plaintiffs moved before the District Judge assigned to the miscellaneous case to seal or redact certain portions of their complaint, including the confidential pricing and reimbursement terms contained in the CPSAs. Judge Vernon S. Broderick granted Plaintiffs leave to file the complaint in redacted form, *id.*, ECF No. 7, pursuant to which Plaintiffs commenced the present case by filing the Complaint.

of the Court.  The Clerk of Court is respectfully requested to terminate the motions pending at docket entries 18 and 22 and to stay this case.

**SO ORDERED.**

**Date:   September 30, 2024**
      **New York, NY**                                                                                   **MARY KAY VYSKOCIL**
                                                            **United States District Judge**